UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X

UNITED STATES OF AMERICA

-against-

YASSA ASHBURN, JAMAL LAURENT, and
TREVELLE MERRITT,

                              Defendants.
---------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

**MEMORANDUM & ORDER**

**13-CR-0303 (NGG)**

This Memorandum and Order addresses the Government's motion to empanel an

anonymous jury for the upcoming trial in this case.  Jury selection is scheduled to begin on

January 26, 2015.  The Government has requested that "the names, precise addresses and

workplaces of members of both the venire and petit juries not be revealed, but that jury selection

and empanelment otherwise proceed normally, without a questionnaire or partial or full

sequestration."  (Gov't Mem. in Supp. of Mot. for Anon. Jury ("Gov't Mot.") (Dkt. 168) at 2.)

In sum, the Government argues that the use of an anonymous jury is warranted because

this case involves charges of violent gang activity, the Defendants have an alleged history of

interference with the judicial process, and this case has attracted and will likely continue to

attract significant publicity.  Defendants[1] oppose the use of an anonymous jury, arguing that it

would unfairly prejudice the Defendants and that it is not justified by the facts in this case.  (See

Defs.' Joint Mem. in Opp'n to Gov't Mot. for Anon. Jury ("Defs.' Opp'n") (Dkt. 185).)  In the

alternative, Defendants insist that if the court decides to empanel an anonymous jury, it should

employ a questionnaire in the jury selection process.  (Id. at 1.)

---

[1] Defendants' Joint Memorandum in Opposition is signed by counsel for Defendants Ashburn, Laurent, and Ralik
Odom.  After Defendants submitted their Opposition, but before this Order was filed, Odom pleaded guilty to
Counts 12 and 16 of the Third Superseding Indictment (the "Indictment") (Dkt. 71.).  (See Nov. 3, 2014, Min. Entry
(Dkt. 219).)  It is unclear whether Defendant Merritt joins in this response.  (See Defs.' Opp'n at 1 n.1.)

In determining whether to empanel an anonymous jury, the court must strike a balance "between the integrity of the criminal justice system and the jurors' concern for their own well-being[,] and the preservation and meaningful efficacy of the presumption of innocence."  United States v. Bellomo, 263 F. Supp. 2d 557, 559 (E.D.N.Y. 2003).  For the reasons that follow, the court has determined that this balance weighs in favor of empaneling an anonymous and semi-sequestered jury.  To assist it in conducting voir dire of potential jurors, however, the court has also decided to utilize a questionnaire.  Accordingly, the Government's motion is GRANTED in part and DENIED in part.

## I.    BACKGROUND

### A.    Charged Criminal Conduct

Defendants are charged by a twenty-one count indictment with numerous racketeering crimes committed in connection with their membership in the Six Tre Outlaw Gangsta Disciples Folk Nation ("Six Tre Folk Nation" or "Six Tre"), which was allegedly responsible for numerous acts of gang-related violence, including homicides, non-fatal shootings, and commercial robberies in Brooklyn and elsewhere beginning in 2007 through 2011.  (Third Superseding Indictment (the "Indictment") (Dkt. 71); Gov't Mot. at 3.)  According to the Government, Six Tre is part of the Folk Nation, a nationwide gang founded in Chicago, Illinois in the early 1990s.  (Gov't Mot. at 2.)  The Government alleges that Six Tre has approximately 20 to 25 identified members and has been operating in and around the Ebbets Field housing projects in the Flatbush section of Brooklyn for several years.  (Id. at 3.)  Specifically, Defendants are charged with being directly responsible for three murders and two attempted murders (id.), as well as several "smash-and-grab" robberies of high-end jewelry stores, and robberies of individuals solicited via the Craigslist website (id. at 5), between April 2008 and October 2011.  The Government also

alleges that the Six Tre Folk Nation was led by Defendant Ashburn from the time of its inception through late 2009.  (Id. at 3.)

The Indictment, dated November 15, 2012, charges each Defendant with multiple counts of criminal conduct.  In particular, each Defendant is charged with one count of racketeering (Count 1), and one count of racketeering conspiracy (Count 2), on the basis of sixteen predicate Racketeering Acts ("RAs"),[2] which include, among others:  conspiracy to murder members of a rival Crips gang (RA 1) as well as an associate of a rival gang known as "Specs" (RA 5); the murders of Courtney Robinson on or about April 20, 2008, Anthony Thomas on or about August 9, 2008, and Brent Duncan on or about June 19, 2010 (RAs 2, 3, 9); the attempted murder of an individual known as "Wrinkles" on or about September 13, 2008, John Doe #1 on or about May 15, 2009, and John Doe #3 on or about June 30, 2010 (RAs 4, 6, 12); Hobbs Act robbery and a robbery conspiracy targeting employees of various jewelry stores (RAs 7, 8); Hobbs Act robberies and a robbery conspiracy concerning individuals targeted through Craigslist (RAs 10, 11, 13, 14, 15); and robbery resulting in the murder of Dasta James on or about January 28, 2011 (RA 16).  (Indictment ¶¶ 6-28.)

In addition, these Defendants are charged in Counts 3 through 5, Counts 8 through 11, and Counts 16 through 21 with various federal crimes predicated on the same or similar conduct at issue in the Racketeering Acts, including:  murder in-aid-of racketeering; assault with a dangerous weapon in-aid-of racketeering; robbery and robbery conspiracy in violation of the Hobbs Act; unlawful use of a firearm; and causing death through use of a firearm.  (Id. at ¶¶ 29-33, 37-42, 49-54.)

---

[2] Defendants Ashburn and Merritt are named in connection with two individual RAs; Defendant Laurent is named in connection with eight individual RAs.

3

**B.    Procedural History**

On August 14, 2014, the Government filed a Motion for an Anonymous Jury, arguing that "[b]ecause this case involves charges of violent gang and organized crime activity, including multiple murders and attempted murders, there is a substantial risk that jurors' judgment and impartiality may be compromised by fear if their names and addresses are revealed." (Gov't Mot. at 2.)  As a result, the Government seeks to have the court withhold the names, precise addresses, and workplaces of members of both the venire and petit juries, but does not seek any form of sequestration, and argues that the use of a questionnaire would be unnecessary. (Id.)  On September 19, 2014, Defendants filed their Response in Opposition to the Government's Motion, arguing that the Government's concerns "do not rise to the level necessary" to infringe on Defendants' rights to the presumption of innocence and to a fair trial under the Sixth Amendment. (Defs.' Opp'n at 2.)  Defendants further argue that if an anonymous jury is empaneled, they will be unable to obtain the "permissible and necessary information for them to exercise their peremptory challenges and to be assured of juror impartiality" unless the court employs a questionnaire in the jury selection procedure. (Id.)  The Government filed a letter in reply to Defendant's Opposition on October 3, 2014. (Gov't Reply (Dkt. 196).)

## II.    LEGAL STANDARD

"Anonymous juries are empaneled in order to protect jurors from harm, to address concerns of jurors regarding their safety, and to prevent potential jury tampering." United States v. Khan, 591 F. Supp. 2d 166, 169 (E.D.N.Y. 2008) (quoting United States v. Gammarano, No. 06-CR-72 (CPS), 2007 WL 2077735, at *4 (E.D.N.Y. July 18, 2007)).  Yet empaneling an anonymous jury also presents "the possibility of unfair prejudice to the defendant and the danger of encroaching on the presumption of innocence." United States v. Tutino, 883 F.2d 1125, 1132

4

(2d Cir. 1989).  Thus, in resolving a motion for an anonymous jury, "courts must balance 'the defendant's interest in conducting meaningful voir dire and in maintaining the presumption of innocence, against the jury's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict.'"  United States v. Taylor, No. 10-CR-268 (DLI), --- F. Supp. 2d ---, 2014 WL 1653194, at *16 (E.D.N.Y. Apr. 24, 2014) (quoting United States v. Quinones, 511 F.3d 289, 295 (2d Cir. 2007)).

The Second Circuit has consistently "made clear that 'when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights.'" United States v. Kadir, 718 F.3d 115, 120 (2d Cir.), cert. denied, 134 S. Ct. 160 (2013) (quoting United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012)).  It has also explained, however, that the "analysis of the potential constitutional impact of an anonymous jury on a defendant 'must receive close judicial scrutiny and be evaluated in the light of reason, principle and common sense.'" Taylor, 2014 WL 1653194, at *16 (quoting United States v. Vario, 943 F.2d 236, 239 (2d Cir. 1991)).  After conducting this analysis, "a court may order the empaneling of an anonymous jury upon (a) concluding that there is strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." Pica, 692 F.3d at 88 (quoting United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006)).  "Within these parameters, the decision whether or not to empanel an anonymous jury is left to the district court's discretion." Id. (quoting Gotti, 459 F.3d at 345).

In determining whether there is strong reason to believe the jury needs protection, courts in this circuit have considered various factors, including:  (1) the dangerousness of the defendants, demonstrated by the seriousness of the crimes charged and whether defendants are

charged with participating in a large-scale criminal enterprise; (2) whether the defendants or their

associates have engaged in past attempts to interfere with the judicial process; (3) whether the

defendants have the ability to interfere with or intimidate the jury; and (4) whether the trial is

likely to attract media attention and publicity.  See United States v. Wilson, 493 F. Supp. 2d 397,

398 (E.D.N.Y. 2006) (citing United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991);

Vario, 943 F.2d at 240; Tutino, 883 F.2d at 1132-33).  While "it is unclear whether any of these

factors individually justif[ies] [e]mpaneling an anonymous jury," "there are numerous cases

indicating that anonymity is appropriate when some combination of these factors is present."

Khan, 591 F. Supp. 2d at 169 (citing Quinones, 511 F.3d at 296).  As the Second Circuit has

pointed out:

> Sufficient reason for empaneling an anonymous jury has
> been found to exist where, for example, the defendants "were
> alleged to be very dangerous individuals engaged in large-scale
> organized crime who had participated in several 'mob-style'
> killings," and there was "strong evidence of defendants' past
> attempts to interfere with the judicial process, and defendants were
> alleged to be part of a group that possessed the means to harm
> jurors," United States v. Thomas, 757 F.2d [1359,] 1364-65 [(2d
> Cir. 1985)]; or where the defendants have been charged with grand
> jury tampering and the trial is expected to attract publicity, . . .
> Vario, 943 F.2d [at] 240 . . . ; United States v. Persico, 832 F.2d
> [705,] 717 [(2d Cir. 1987)] (warranted by history of violence and
> willingness to corrupt and obstruct justice, together with
> expectation of extensive publicity); or where the defendant has a
> history of attempted jury tampering and a serious criminal record,
> . . . Tutino, 883 F.2d at 1132-33; or where there had been extensive
> pretrial publicity and there were abundant allegations of dangerous
> and unscrupulous conduct, United States v. Barnes, 604 F.2d 121,
> 141 (2d Cir. 1979).

Paccione, 949 F.2d at 1192.

"If a district court determines that an anonymous jury is appropriate, the court must take

'reasonable precautions to minimize any prejudicial effects on the defendant and to ensure

protection of his fundamental rights.'"  Kadir, 718 F.3d at 120 (quoting United States v. Thai, 29

F.3d 785, 801 (2d Cir. 1994)).  Indeed, a defendant's fundamental rights "must be protected 'by the court's conduct of a <u>voir dire</u> designed to uncover bias as to issues in the cases [sic] and as to the defendant,' and by 'taking care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities.'"  <u>Thai</u>, 29 F.3d at 801 (quoting <u>Paccione</u>, 949 F.2d at 1192); <u>see also</u> <u>United States v. Herron</u>, 2 F. Supp. 3d 391, 396-97 (E.D.N.Y. 2014).

## III.  DISCUSSION

After considering each of the relevant factors, the court concludes that the balance of the interests ultimately weighs in favor of empanelling an anonymous jury.  In fact, the need to protect the jury is so strong that—despite the limited nature of the Government's request (<u>see</u> Gov't Mot. at 2)—the court determines that semi-sequestration is also warranted in this case. Nevertheless, the voir dire to be conducted by the court will include the use of a questionnaire. Furthermore, both the written and oral questioning will be designed to sufficiently address Defendants' concerns with respect to their ability to uncover any bias on the part of prospective jurors, who will be provided with a plausible and nonprejudicial explanation for these adjustments to the process.

### A.    Need for Protection

With respect to the first prong of the analysis, the Government argues that each of the four factors counsels in favor of protecting jurors' identities.  (Gov't Mot. at 9-13.)  In maintaining that there is "strong reason" the jury needs protection in this case, the Government further asserts that "[m]ost importantly, the defendants are dangerous and, based on the evidence to be presented at trial, they are likely to be perceived by the jurors as dangerous."  (<u>Id.</u> at 9.) Defendants, however, contend that evaluating each factor militates against finding an anonymous jury is warranted.  (Defs.' Opp'n at 14-19.)  Most significantly, Defendants insist that "there are

no allegations that the Defendants have engaged in any acts of witness intimidation or that they would have the means to tamper with the jury."  (Id. at 2.)  Ultimately, Defendants argue that the "assumption of dangerousness" generated by the instruction to withhold certain information "will prejudice the entire venire against the Defendants," and could cause them to "voluntarily withhold additional information" during voir dire, including "questions about whether they could be fair and impartial."  (Id. at 6.)  While these concerns are always present when courts evaluate any motion to empanel an anonymous jury, here the court has determined that the public's interest in the integrity of the criminal justice system and the jury's interest in remaining free from real or threatened violence are more substantial.

       1.   <u>Dangerousness of the Defendants</u>

Courts evaluate defendants' dangerousness by assessing the seriousness of the charged crimes and whether defendants are charged with participating in a large-scale criminal enterprise. See, e.g., Gotti, 459 F.3d at 346 (observing that defendants were charged with both membership in and leadership of an organized crime family, and that defendants had been detained pending trial due to their "dangerousness"); Wilson, 493 F. Supp. 2d at 399-401 (observing that defendant was charged with murdering two police officers and was a member of a violent criminal gang).  However, the nature of the charges against a defendant "does not, ipso facto, require" empanelling an anonymous jury.  United States v. Mostafa, 7 F. Supp. 3d 334, 336 (S.D.N.Y. 2014) ("Indeed, to so find would run counter to the cloak of innocence that surrounds any defendant on trial in this country.").  Moreover, "[t]he invocation of the words 'organized crime' . . . unless there is something more, does not warrant an anonymous jury." Vario, 943 F.2d at 241.

          This "something more" can be a demonstrable history or likelihood
          of obstruction of justice on the part of the defendant or others

> acting on his behalf or a showing that trial evidence will depict a
> pattern of violence by the defendants and [their] associates such as
> would cause a juror to reasonably fear for his own safety.

Id.; see also United States v. Millan-Colon, 834 F. Supp. 78, 84 (S.D.N.Y. 1993) ("Before a district judge may rely on the organized crime connection of a defendant as a factor in the question of anonymous juries, he must make a determination that this connection has some direct relevance to the question of juror fears or safety in the trial at hand, beyond the innuendo that this connection conjures up.").

According to the Government, Defendants are members of the Six Tre Folk Nation gang, which "terrorized the inhabitants of the Ebbets Field housing projects" for several years through "numerous acts of gang-related violence, including homicides, non-fatal shootings and commercial robberies" both in and around the Flatbush area of Brooklyn.  (Gov't Reply at 1-2; Gov't Mot. at 3.)  The Government also alleges that Defendant Ashburn served as the gang's leader from the time of its inception during 2007 through late 2009.  (Gov't Mot. at 3.) Significantly, courts have reasoned that "leadership of a criminal organization indicates a Defendant's propensity for violence."  Khan, 591 F. Supp. 2d at 170-71 (citing Wilson, 493 F. Supp. 2d at 400).  Although Defendants' affiliation with a violent criminal organization, by itself, is insufficient to warrant empaneling an anonymous jury, see Vario, 943 F.2d at 241,[3] here, the Government indicates that "trial evidence will depict a pattern of violence by the defendants and [their] associates," id., which has caused the residents of Ebbets Field and others to live for years "in fear of the Six Tre and the brutal violence committed by many of its members."  (Gov't Mot. at 6.)

---

[3] Even leadership of a criminal enterprise may not be sufficient on its own to justify protecting jurors' identities. See United States v. Gambino, 818 F. Supp. 536, 540 (E.D.N.Y. 1993) (denying anonymous jury motion in trial of alleged captain of Gambino organized crime family).

Defendants do not dispute that the crimes they are charged with committing are serious. (See Defs.' Opp'n at 14.)[4] As the Government points out, while all Defendants face principal charges of racketeering and racketeering conspiracy, each is also charged in specific predicate acts involving murder, attempted murder, or both. (Gov't Mot. at 10.) In addition, Defendants are charged individually with other violent federal crimes, including assault with a dangerous weapon in-aid-of racketeering, Hobbs Act robbery, and unlawful use of a firearm. (Indictment ¶¶ 29, 33, 39, 40-45, 48-53.) "While the Indictment does not charge crimes that necessarily involve obstruction of justice, much of the evidence that the Government intends to present will involve acts of violence aimed at protecting and expanding the enterprise and keeping victims and rivals in fear of the enterprise and its members." United States v. Lemos, No. 10-CR-954 (NGG), 2012 WL 6151733, at *2 (E.D.N.Y. Dec. 11, 2012). (See also Indictment ¶ 4-5.) For example, the Government alleges that Defendant Ashburn killed Courtney Robinson during a fight that erupted at Robinson's niece's birthday party at Ebbets Field, because Ashburn mistakenly believed Robinson to be a member of the rival Crips gang. (Gov't Mot. at 3-4.) The Government also alleges that Defendants' co-conspirator, Ralik Odom—having received a report that the leader of the President Street Crips crew had been spotted at a block party near Ebbets Field—attempted to kill the rival and fired several shots into a crowd with a semi-automatic

---

[4] Instead, Defendants respond that "the Government's argument that the nature of the charges in the indictment warrants an anonymous jury requires the belief that those charges are true before there has been an actual trial." (Defs.' Opp'n at 14.) There is, however, no such requirement. "Despite the unproven nature of charged conduct, 'what crimes a defendant has been charged with in an indictment are a relevant and appropriate consideration in determining whether to empanel an anonymous jury." Herron, 2 F. Supp. 3d at 398 (quoting United States v. Prado, No. 10-CR-74 (JFB), 2011 WL 3472509, at *7 n.5 (E.D.N.Y. Aug. 5, 2011)); see also United States v. Mayes, No. 12-CR-385 (ARR), 2013 WL 6175824, at *4 (E.D.N.Y. Nov. 25, 2013) ("As the defendants note, the government has presented accusations, not proof, and the defendants are not charged in the indictment with witness tampering, jury tampering, or obstruction of justice. . . . Still, the court can rely on the government's proffer of facts to determine whether there is reason to believe that the jury needs protection." (internal citations and footnote omitted) (citing United States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994))); Gotti, 459 F.3d at 346. Moreover, the Second Circuit has repeatedly held that district courts are not obligated to conduct evidentiary hearings regarding the Government's allegations in support of an anonymous jury motion. See Kadir, 718 F.3d at 121 (citing United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995)).

weapon.  (Id. at 4.)  Additionally, the Government alleges that Defendant Laurent shot and killed Brent Duncan on the street outside of a house party because Laurent believed, also mistakenly, that Duncan was a member of the Crips gang.  (Id.)

Not only are the charges serious and connected to a pattern of violence, but they also represent crimes that—apart from the "innuendo" conjured by the specter of organized crime—are especially likely to cause reasonable jurors to fear for their safety.  As the Government points out, "many of the victims of these crimes were innocent of any criminal conduct or gang affiliation."  (Gov't Mot. at 10.)  For instance, when Defendants' co-conspirator Odom fired several shots into a crowd at the block party described above, he hit a ten-year-old girl, who was immediately taken to a hospital to treat her injuries.  (Id. at 4.)  As another example, Defendant Laurent and one of his associates are charged with committing a series of robberies of individuals solicited over the internet via Craigslist.  (Id. at 5.)  Furthermore, the Government claims that the evidence at trial will show that "many local residents fear retribution by the gang for speaking out about its criminal activities, or being seen as cooperating with law enforcement."  (Id. at 6.)  As a result, it is likely that the nature of the charges and evidence in this case would cause reasonable jurors to perceive Defendants as dangerous.  See United States v. Mayes, No. 12-CR-385 (ARR), 2013 WL 6175824, at *4 (E.D.N.Y. Nov. 25, 2013) ("Hearing this evidence, in combination with the violent nature of the charges, could lead jurors to fear for their safety unless their identities are kept anonymous."); Barnes, 604 F.2d at 141 (holding anonymous jury was appropriate where there had been extensive pretrial publicity and abundant allegations of dangerous and unscrupulous conduct).  This seems particularly true here, given the callous nature of the alleged murders and the fact that there will be multiple defendants on trial for similar conduct.  See United States v. Ferguson, 758 F.2d 843, 854 (2d Cir. 1985) (taking the

11

number of defendants on trial into account in evaluating whether jury needed protection). Accordingly, the court finds that Defendants' dangerousness weighs heavily in favor of empanelling an anonymous jury.

### 2.    Attempts to Interfere with Judicial Process

The next factor courts consider in determining whether there is "strong reason" to believe the jury needs protection is whether defendants have previously attempted to interfere with the judicial process. In this analysis, courts traditionally look for evidence of prior attempts by the defendant to engage in intimidation or bribery of, or violence toward, either witnesses or jurors. See, e.g., United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995) (noting defendants had an associate threaten a witness's life and offer $50,000 for the witness's silence); Paccione, 949 F.2d at 1192-93 (noting that government witness had received anonymous, middle-of-the-night phone calls advising him to "remember [ ] nothing" and that a defendant had threatened others with a baseball bat and pistol); Vario, 943 F.2d at 240 (noting co-conspirator had approached a grand jury witness). Importantly, "[t]his factor has been described as 'crucial' to the determination to empanel an anonymous jury." United States v. Locascio, 357 F. Supp. 2d 558, 561 (E.D.N.Y. 2005) (citing Vario, 943 F.2d at 239 ("An obstruction of justice charge, particularly one involving jury tampering, has always been a crucial factor in our decisions regarding anonymous juries.")). It is particularly significant in the decision because whether Defendants have previously attempted to obstruct justice is the most relevant evidence—among the various factors—regarding the threat posed by Defendants to juror safety and the integrity of the criminal justice system.

Thus, courts evaluating anonymous jury motions have taken care to distinguish between allegations of violence in the underlying criminal offense and allegations of violence toward the

judicial process in particular.  See, e.g., Millan-Colon, 834 F. Supp. at 83 (citing United States v. Coonan, 664 F. Supp. 861, 863 ("[I]t has been our observation over the years that there is a category of persons who, although prone to the most outlandish conduct, seem to draw the line at interfering with those who are engaged in the administration of the judicial process."), adhered to on reconsideration, 671 F. Supp. 959 (S.D.N.Y. 1987)).  To be clear, however, the Government need not charge a defendant with obstruction of justice in the indictment in order for this factor to militate in favor of protecting the jury.  See, e.g., Mayes, 2013 WL 6175824, at *3 ("[T]he defendants are not charged in the indictment with witness tampering, jury tampering, or obstruction of justice. . . . Still, the court can rely on the government's proffer of facts to determine whether the jury needs protection.") (internal citations and footnote omitted).

### a.      Past Attempts to Interfere

Defendants argue that there are "no allegations that [they] have attempted to interfere with the judicial process either in this case or in other proceedings."  (Defs.' Opp'n at 17.)  In its Motion, however, the Government alleges that "[Six Tre] members have engaged in acts of witness intimidation," and that the gang "views 'snitching' as a capital offense and has placed residents of the Ebbets Field neighborhood in fear of retribution for speaking out about its criminal activities."  (Gov't Mot. at 6, 12.)  But as other courts have held, "[i]t is not enough that other members of the organized crime family with which they are allegedly aligned may have" participated in or directed efforts to obstruct justice.  United States v. Gambino, 818 F. Supp. 536, 540 (E.D.N.Y. 1993).  As a result, these allegations alone are insufficient for this factor to counsel in favor of empanelling an anonymous jury.  See United States v. Melendez, 743 F. Supp. 134, 138 (E.D.N.Y. 1990) ("In substance, it is alleged that threats of violence have been made to various prosecutors assigned to the case, as well as Government witnesses.  Although

the Court is concerned as to such allegations, the Government has failed to show with any reasonable certainty that these threats are related to this case.").

In reply, however, the Government counters that Defendant Laurent "has repeatedly demonstrated contempt for the judicial process." (Gov't Reply at 2.) As evidence, the Government points to Laurent's refusal to allow state law enforcement officers to execute a search warrant to collect his DNA by buccal swab on two occasions during 2011, while he was already in federal custody. (Id.; Gov't Mem. in Opp'n to Def. Laurent's Omnibus Pre-Trial Mot. (Dkt. 180) at 34-35.) According to the Government, on one occasion, Laurent "snapped the Q-Tip one of the detectives was holding, and then told the detectives to 'suck my dick'"; on another occasion, after appearing before a judge who directed him to comply with the warrant, Laurent allegedly left the courtroom and "turned over [a] table in a conference room." (Gov't Reply at 2.) Subsequent to the briefing for this Motion, the court authorized a search warrant to be executed to obtain Defendant Laurent's DNA by buccal swab in connection with this case. In re Application for a Search Warrant, No. 14-MC-1295 (NGG) (JO), (E.D.N.Y.), ECF No. 2. At an October 23, 2014, hearing regarding the validity of the search warrant, Laurent again refused to submit to the buccal swab, made disrespectful remarks about the court, and walked out of the courtroom during the middle of the proceeding.

This conduct certainly constitutes unacceptable contempt for judicial process and substantially undermines defense counsel's assertion that Defendants "have always been polite and respectful in Court and have given the Court no reason to find that they would endanger or impede the judicial process." (Defs.' Opp'n at 17.) While this behavior does not equate to the type of jury or witness tampering that the Second Circuit has previously deemed sufficient to warrant empanelling an anonymous jury, cf. Quinones, 511 F.3d at 295-96 (indictment

specifically charged defendants with murdering a confidential informant in retaliation for his cooperation with law enforcement authorities); Aulicino, 44 F.3d at 1116; Paccione, 949 F.2d at 1192–93; Vario, 943 F.2d at 240, the defendant's "disrespect, if not outright contempt, for the processes by which the charges against him will be resolved," surely strengthens the case for empaneling an anonymous jury.  United States v. Burnett, No. 95-CR-272 (JG), 1996 WL 1057161, at *13 (E.D.N.Y. Mar. 11, 1996).  In this regard, the court further notes that during pre-trial proceedings, Defendants' courtroom behavior—which included shouting with spectators in the gallery and yelling at the attorneys—was so inappropriate that after the court issued a warning and Defendants failed to cooperate, they were no longer permitted to appear at status conferences simultaneously.  As a result, Defendants' lack of respect for the judicial process suggests there is a serious need to protect the jury in this case.

b.    *Ex Parte Submission*

The Government has also explained that it "recently learned of efforts by at least two of the defendants to intimidate an individual they apparently believe to be a witness for the government in this case."  (Gov't Reply at 2.)  In support of this allegation, the Government filed under seal a separate, ex parte submission providing further detail regarding these efforts.  (Id.; Oct. 6, 2014, Ltr. (Ex Parte) Supplementing Gov't Reply ("Ex Parte Ltr.") (Dkt. 198).)  Counsel for Defendant Laurent subsequently filed a letter objecting to this communication and requesting that the court either (1) provide a copy of the Government's ex parte submission to Defendants, or (2) not consider the additional detail in deciding the Government's Motion for an Anonymous Jury.  (Oct. 14, 2014, Ltr. in Obj. to Ex Parte Ltr. (Dkt. 202) at 1.)

The Second Circuit has previously suggested that courts may consider ex parte submissions in evaluating anonymous jury motions.  See Paccione, 949 F.2d at 1193 (taking into account an "additional affirmation, submitted to the court ex parte . . . because of an ongoing

grand jury investigation and the potential danger to witnesses who had testified before that body," which "provided . . . other details supporting the government's assertions as to the circumstances surrounding the killing [and] defendants' ties to organized crime, and the probability that that murder had been arranged by one or more of the defendants"). Ex parte communication between the Government and the court, however, is disfavored, as it deprives the defendant of notice of the precise content of the communication and an opportunity to respond, see In re Taylor, 567 F.2d 1183, 1187-88 (2d Cir. 1977), and can thereby "create both the appearance of impropriety and the possibility of actual misconduct." United States v. Napue, 834 F.2d 1311, 1319 (7th Cir. 1987) ("Even where the government acts in good faith and diligently attempts to present information fairly during an ex parte proceeding, the government's information is likely to be less reliable and the court's ultimate findings less accurate than if the defendant had been permitted to participate."). Still, this does not mean that ex parte communication is never appropriate. For example, ex parte communications between courts and prosecutors "have been recognized as necessary where the safety of witnesses is concerned." United States v. McTier, No. 05-CR-401 (ILG), 2006 WL 2707439, at *1 (E.D.N.Y. Sept. 20, 2006) (citing Napue, 834 F.2d 1311; United States v. Pringle, 751 F.2d 419 (1st Cir. 1984)).

Nevertheless, even where the Government's ex parte submission is made in the form of a sworn affirmation, courts in this district have varied in their willingness to take the contents of such communication into account.[5] Compare United States v. Khan, 591 F. Supp. 2d 166, 170

---

[5] Courts in other circuits have been willing to take sealed, ex parte submissions into account when evaluating motions for anonymous juries. See, e.g., United States v. Eiland, No. 04-CR-379 (RCL), 2006 WL 288403, at *4 (D.D.C. Jan. 31, 2006) ("In response to [defendant]'s request (joined by several co-defendants) to view the in camera submission that the Government filed under seal in support of its motion for anonymous jury, this Court finds no basis to require such disclosure. The submission contains detailed factual representations that might reveal the identity of government witnesses."); United States v. Edwards, 119 F. Supp. 2d 589, 595 (M.D. La. 2000) ("It is clear from the Fifth Circuit jurisprudence that a trial court may consider various forms of evidence in deciding whether to empanel an anonymous jury. . . . The courts may receive evidence in camera and/or ex parte." (citing

(E.D.N.Y. 2008) (Irizarry, J.) ("[The] Ex Parte Affirmation, on its own, provides significant evidence of Defendant's willingness to tamper with the judicial process.  It is within the context of these alleged facts that the court finds that Defendant's willingness to threaten or merely to bribe just one juror . . . is not beyond imagination."), and United States v. McDonnell, No. 04-CR-203 (ARR), 2005 WL 1544804, at *3 (E.D.N.Y. July 1, 2005) (Ross, J.) ("Notwithstanding [defendant]'s denial of involvement with the Bloods, the government has made a sufficient in camera showing that [defendant] was at least a member of that gang." (citing ex parte affidavit)), with Nov. 13, 2013, Gov't Ltr. at 1, United States v. Mayes, No. 12-CR-385 (ARR) (E.D.N.Y.) (Ross, J.), ECF No. 93 ("During the October 30, 2013 status conference, the Court informed the parties that it would not consider the Supplemental Affidavit unless it was made available to the defendants and their attorneys."), and United States v. Melendez, 743 F. Supp. 134, 138 (E.D.N.Y. 1990) (Spatt, J.) ("[T]he Government submitted an ex parte affirmation, which the Court refused to consider on this application, unless counsel for all parties were furnished with copies.").[6]

---

Paccione, 949 F.2d 1183; United States v. Salvatore, 110 F.3d 1131 (5th Cir. 1997), abrogated on other grounds, Cleveland v. United States, 531 U.S. 12 (2000))).  For example, in United States v. Edmond, the D.C. Circuit held:

> Even were we to require some evidence of a defendant's inclination toward jury tampering, however, we think such evidence existed in the record before the District Court.  Before ordering juror anonymity in this case, the trial judge received from the Government an in camera submission describing threats to witnesses.  This submission stated that two confidential sources had reported that [defendant]'s father intended to "take care of the witnesses" in the case, and that a caller falsely representing herself as a relative of . . . an important Government witness, had telephoned an assistant United States attorney in an effort to elicit information about [the witness]'s whereabouts.  Numerous court decisions illustrate that such information, indicating a general willingness to obstruct justice on the part of a defendant or his associates, is more than adequate to suggest a real possibility that a defendant will threaten or otherwise tamper with jurors.

52 F.3d 1080, 1091-92 (D.C. Cir. 1995) (internal citations omitted) (citing, among other cases, Aulicino, 44 F.3d at 1116; United States v. Wong, 40 F.3d 1347, 1376-77 (2d Cir. 1994); United States v. Amuso, 21 F.3d 1251, 1264 (2d Cir. 1994); Paccione, 949 F.2d at 1193; Thomas, 757 F.2d at 1364).

[6] It is worth noting, however, that Judge Spatt's decision in Melendez predated the Second Circuit's decision in Paccione.

Other courts have implicitly acknowledged the issue but found it unnecessary to rely on the contents of an ex parte affirmation to reach a decision on the motion for an anonymous jury. See Kadir, 718 F.3d at 121 (noting that "because there were sufficient independent grounds for empaneling an anonymous jury," it was not necessary to address defendant's argument that the district court should not have relied on reports by jailhouse informants that the defendant had threatened to harm potential witnesses); United States v. Prado, No. 10-CR-74 (JFB), 2011 WL 3472509, at *7 n.5 (E.D.N.Y. Aug. 5, 2011) ("The government also indicated that they would present evidence at trial that [the defendant] threatened another inmate at the [prison] whom [the defendant] believed to be cooperating with law enforcement. . . . The Court has not relied upon these allegations in reaching its holding here." (citing Locascio, 357 F. Supp. 2d at 562)).[7]

Here, however, the Government's sealed, ex parte submission consists of only a letter unaccompanied by a sworn affirmation.  See Millan-Colon, 834 F. Supp. at 84 n.4 (noting that "[a]lthough the Government has recently alleged that a confidential informant confirmed its 'fears' as to the defendants' intention to interfere with the judicial process, the Court cannot credit this evidence at this time," as it "constitute[d] unverified and unsworn triple hearsay"; and

---

[7] See also United States v. Giampa, in which the Government submitted a sealed, ex parte affirmation that presented evidence "strongly suggesting" that defendant Giampa had intimidated a witness who was expected to testify at trial. No. S 92-CR-437 (PKL), 1992 WL 295983, at *4 (S.D.N.Y. Oct. 6, 1992).  Giampa's co-defendant, Giampapa, argued that because the affirmation alleged conduct only with respect to Giampa, if the court determined that the sealed affirmation established sufficient reason to grant the request for an anonymous jury, the court should sever Giampapa's trial.  Id.  Judge Leisure held:

> [W]hile the sealed ex parte application clearly provides strong additional support on the anonymous jury issue with respect to defendant Giampa, the information contained in that sealed affirmation is not necessary to the Court's determination on this issue.  Rather, the [other] Affirmation, which is public and available to the defendants, and the allegations in the indictment, contain sufficient information, by themselves, to warrant the Court's finding that an anonymous jury is appropriate in the instant case as to both defendant Giampa and defendant Giampapa.  Even in the absence of the information contained in the sealed ex parte application, the Court would find that, based upon the other considerations set forth in this opinion, that an anonymous jury is warranted as to both defendants.

Id.

holding that "while the Court notes the Government's allegations for the record, these allegations have no persuasive effect").[8]  Consequently, the strength of the Government's allegations that certain Defendants have attempted to engage in witness intimidation is not analogous to the strength of the evidence considered by the Second Circuit in Paccione or the strength of the evidence considered in Khan and even rejected in Mayes.  The court therefore takes note of these allegations for the record, since they are summarized in the Government's Reply Letter (see Gov't Reply at 2), but declines to rely on the substance of the sealed, ex parte submission as support for empanelling an anonymous jury.[9]  See Herron, 2 F. Supp. 3d at 398 (declining to rely on the Government's allegation of current witness tampering because "it is not charged in the indictment (and therefore is untested by a grand jury) and is unsupported by other evidence or indicia of reliability").

### c.   Propensity to Interfere

Whether Defendants have engaged in prior attempts to interfere with the judicial process, however, is not the only relevant question with respect to this factor.  Instead, courts "may appropriately consider a defendant's propensity to threaten witnesses or otherwise to tamper with the judicial process in evaluating the need for an anonymous jury."  Quinones, 511 F.3d at 296 n.6 (emphasis added).  In evaluating a defendant's propensity to obstruct justice, district courts in this circuit have frequently taken into account the severity of the defendant's anticipated criminal

---

[8] Unlike the Government's allegations that "[g]ang members have engaged in acts of witness intimidation," that "many local residents fear retribution by the gang for speaking out about its criminal activities, or being seen as cooperating with law enforcement," and that the gang views "snitching" as "a capital offense," the Government has not indicated or suggested that it will introduce at trial any evidence regarding the substance of its ex parte letter (cf. Gov't Mot. at 6).  See Wong, 40 F.3d at 1376-77 ("The record in this case amply supports the district court's conclusion that the jury needed protection.  The government's pretrial proffer on this issue, borne out by evidence at trial, indicated that the [defendants' gang] had an extensive history of interfering with the judicial process." (emphasis added)).

[9] In other words, even without taking into account the information contained in the Government's ex parte submission, the court—for the reasons explained in this Memorandum and Order—reaches the conclusion that an anonymous jury is warranted.  As a result, it is not necessary for the court to decide whether it can consider the contents of an ex parte letter unaccompanied by a sworn affidavit, a question that might be required in a closer case.

punishment.  See, e.g., Mayes, 2013 WL 6175824, at *4 ("The defendants face lengthy prison sentences and substantial financial penalties, creating a stronger motive to tamper with a jury." (citing Paccione, 949 F.2d at 1192; Locascio, 357 F. Supp. 2d at 561)); United States v. Antico, No. 08-CR-559 (S-6) (CBA), 2010 WL 2545877, at *1 (E.D.N.Y. June 11, 2010) ("If convicted, the defendant faces a substantial prison term . . . . [which] provides [defendant] with an incentive to tamper with the jury."), aff'd sub nom. United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012). As noted above, not only do all Defendants face principal charges of racketeering and racketeering conspiracy, but each is also charged in specific predicate acts involving murder, attempted murder, or both.  (Gov't Mot. at 10.)  These charges, and the substantial prison sentences that could be imposed upon conviction, including multiple life sentences, surely provide these Defendants with incentive to engage in witness or jury tampering.  See United States v. Bellomo, 954 F. Supp. 630, 654 (S.D.N.Y. 1997) ("[A]ll of the defendants face terms of up to 20 years if convicted under the RICO statute in addition to significant penalties for conviction on the numerous alleged substantive violations.  As a practical matter, many of the defendants, if convicted, could spend the rest of their lives in prison.").

Thus, although the Government has not offered much factual support regarding Defendants' alleged past attempts to interfere with witnesses, Defendants have repeatedly demonstrated their contempt for judicial process before this court, as illustrated by their courtroom behavior, and in particular, Defendant Laurent's disregard for judicial search warrants.  Still, whether defendants have been charged with interference in the judicial process "has always been a crucial factor" in the decision on whether to empanel an anonymous jury. See Gambino, 818 F. Supp. at 540 (quoting Vario, 943 F.2d at 240).  As a result, the court's analysis of the second factor has a meaningful but nondispositive effect on the ultimate

20

determination.  Therefore, something more is required to establish "strong reason" why the jury needs protection.

        3.    <u>Means to Harm the Jury</u>

The third factor courts consider is whether Defendants have the ability to harm the jury. Defendants argue that because they are incarcerated, "[i]t would be highly difficult if not impossible for the Defendants to issue any threats or interfere with the judicial process without the Government being immediately alerted to such misconduct."  (Defs.' Opp'n at 16-17.) "When a defendant is under pretrial detention, whether he has the means to harm the jury often hinges on the extent of his connections outside of prison."  <u>Herron</u>, 2 F. Supp. 3d at 396 (citing <u>Wilson</u>, 493 F. Supp. 2d at 400 (granting motion for anonymous jury in part because defendant was "a member of the Stapleton Crew and . . . this organization has other members and associates who are currently, and will be, at large at the time of the trial")); <u>see also</u> <u>Wong</u>, 40 F.3d at 1377.  Here, as the Government points out, "[n]otwithstanding the arrest and prosecution of [these] defendants, other members of the gang remain at large," "and will be at large at the time of the trial."  (Gov't Reply at 2; Gov't Mot. at 12 (quoting <u>Wilson</u>, 493 F. Supp. 2d at 400)). Accordingly, the court agrees that Defendants "have the ability to attempt to improperly influence members of the jury should they choose to do so."  (Gov't Reply at 2.)  <u>See</u> <u>Mayes</u>, 2013 WL 6175824, at *3 ("In numerous cases, courts in this Circuit have found that defendants' membership in a criminal organization with members still at large demonstrates an ongoing ability to interfere with the judicial process." (citing <u>Thai</u>, 29 F.3d at 801; <u>Thomas</u>, 757 F.2d at 1365; <u>Prado</u>, 2011 WL 3472509, at *8; <u>Wilson</u>, 493 F. Supp. 2d at 399-400)).

Furthermore, the Government alleges that Defendant Ashburn served as the gang's leader from the time of its inception during 2007 through late 2009.  (Gov't Mot. at 3.)  As courts have

observed, a defendant with former leadership status in a criminal organization has the standing and "potential ability to influence and exercise control over its members" to a more significant extent.  United States v. Bellomo, 263 F. Supp. 2d 557, 559 (E.D.N.Y. 2003); see also Antico, 2010 WL 2545877, at *4 (relying, in part, on "the ability of the defendant to enlist the resources of the Genovese crime family" as a factor supporting anonymity).  As a result of Defendant Ashburn's leadership status, "some followers may feel compelled to act on his behalf, even without any direction" from him.  Herron, 2 F. Supp. 3d at 397.  Accordingly, this factor firmly counsels in favor of protecting the jury.[10]

### 4.    Publicity

The fourth factor to consider is whether the trial is likely to attract media attention and publicity.[11]  The Government argues that "based on the pretrial publicity thus far, the upcoming trial is likely to attract significant media attention."  (Gov't Mot. at 12.)  In support, the Government cites several articles published by a range of news outlets, including CBS News, Fox News, the New York Times, the New York Post, and the Huffington Post.  (Id. at 12-13.) This media coverage related to the unsealing of the Indictment in January 2012, the February 2012 arrest of Devon Rodney—the then-current leader of Six Tre Folk Nation—and Rodney's guilty plea in March 2014.  (Id.)  Defendants counter that "the prospect of media coverage here is a far cry from the type of media coverage typically cited by courts in granting a request for an anonymous jury," and that "a few outdated media stories do not create the sort of risk to the

---

[10] In this respect, it is worth noting that "where one co-defendant warrants an anonymous jury, the due process rights of other co-defendants are not violated by its [e]mpanelment, even where no evidence links them to any activity justifying such precautions."  United States v. McDonnell, No. 04-CR-203 (ARR), 2005 WL 1544804, at *3 n.3 (E.D.N.Y. July 1, 2005) (citing Aulicino, 44 F.3d at 1117).

[11] As Judge Sifton explained in Gammarano, "[p]ublicity enhances the likelihood that jurors['] names will become public, exposing them to intimidation or harassment.  Since it is probable that the case will receive some media attention, jurors may also feel compelled to make decisions on the basis of concerns about public scrutiny or fear, rather than on the basis of the evidence presented."  2007 WL 2077735, at *6 (citing Vario, 943 F.2d at 240; Barnes, 604 F.2d at 140-41).

jurors that has traditionally contributed to a court's decision regarding anonymity."  (Defs.'
Opp'n at 18.)

Defendants' position, however, is not supported by the caselaw.  First, the question does
not turn on the volume of pre-trial news coverage alone; rather, courts consider both the amount
and nature of the publicity.  For example, in Vario, the Second Circuit held that the district court
had not erred in finding that there was a possibility of significant media attention, "even though
only one article had been written prior to the trial[,] since that article was a Newsday cover story
that 'detailed the extensive nature of the conspiracy charged.'"  Gammarano, 2007 WL 2077735,
at *6 n.27 (quoting Vario, 943 F.2d at 240).  Second, the issue is not whether the pre-trial media
attention has been significant on its own, but whether this attention reasonably suggests that
there will be significant news coverage during the trial.  See Vario, 943 F.2d at 240 ("Although
no publicity followed this initial article, we cannot say that at the time that the anonymous jury
motion was made, the government's prediction that publicity would continue was unreasonable
or unjustified," even though "later developments may have proved this prediction wrong."); see
also id. (noting that the "'extensive publicity this case is expected to continue to attract'
supported use of anonymous jury" (emphasis in original) (quoting Persico, 832 F.2d at 717)).

Here, the Government has offered evidence that the unsealing of the Indictment alone
generated substantial coverage across at least four major national news platforms, and that
national media attention resumed two years later, when this court accepted Rodney's guilty plea.
(Gov't Mot. at 12-13.)  Given the numerous press reports related to pre-trial matters, the court
can reasonably anticipate that media attention is likely to be substantial during the trial itself.
See Herron, 2 F. Supp. 3d at 397-98 ("Although Defendant argues that the lack of recent media
attention demonstrates that interest has abated . . . the court finds that with the increased case

23

activity associated with trial, it is reasonable to expect renewed media scrutiny."); accord

Bellomo, 263 F. Supp. 2d at 559 ("This case has already attracted pretrial publicity, but hardly as

much as it will surely attract when the trial gets underway.").  Significant media attention and

publicity is even more likely as a result of Defendants' association with the Six Tre gang.  See,

e.g., United States v. Tomero, 486 F. Supp. 2d 320, 323 (S.D.N.Y. 2007) ("[G]iven the amount

of press coverage that organized crime traditionally has received, the profile of the trial is likely

to become higher.").  Therefore, the court finds no difficulty in concluding that the "prospect of

publicity militates in favor of jury anonymity to prevent exposure of the jurors to intimidation or

harassment."  Wong, 40 F.3d at 1377 (citing Vario, 943 F.2d at 240).

> 5.    Conclusion

In sum, the court's analysis of the relevant factors demonstrates that based on the totality

of the circumstances, there is "strong reason" to protect the jury in this case.  See Locascio, 357

F. Supp. 2d at 560.  There are multiple defendants, each of whom is charged with extremely

serious crimes that relate to the murder of innocent victims committed in furtherance of a violent

criminal enterprise.  Thus, jurors are likely to view these defendants as particularly dangerous

and callous.  While Defendants are only vaguely alleged to have tampered with witnesses in this

case, Defendants have demonstrated a contumacious lack of respect for the judicial process

during pre-trial proceedings.  Moreover, defendants possess the motive and means to harm the

jury, as each defendant faces prison sentences of extremely significant length and several

members of this violent gang will remain at large during trial.  Lastly, news coverage of pre-trial

matters suggests that extensive publicity at trial is likely.  In the Second Circuit, this is a

sufficient basis for concluding that an anonymous jury is warranted.  See Kadir, 718 F.3d at 121

(affirming empanelment of anonymous jury where district court reasonably concluded "jurors

would be fearful if their identities were revealed to these defendants," a ruling that was "buttressed by the extensive media coverage of the case"); Paccione, 949 F.2d at 1192 (observing that anonymous juries have been imposed "where there had been extensive pretrial publicity and there were abundant allegations of dangerous and unscrupulous conduct" (citing Barnes, 604 F.2d at 141)).

Moreover, this analysis further compels the court to conclude that daytime sequestration and transport to and from an undisclosed location is also necessary in this case. While the Government has not requested that the jury be sequestered in any way, the court is convinced that semi-sequestration is the only way to adequately protect the jury. See Wilson, 493 F. Supp. 2d at 400. In light of the violent nature of the crimes charged and of the Six Tre Folk Nation more generally, Defendants' manifest disrespect for judicial process, the opportunity for Defendants to engage in jury tampering through known associates who remain at large, and the likelihood of significant press attention, there is a serious risk that jurors will be subject to inappropriate contact from either the media or other members of Defendants' criminal enterprise. The court does not, however, take lightly the concern that semi-sequestration could give rise to the possibility of additional prejudice to Defendants. See, e.g., Thomas, 757 F.2d at 1364 (noting that "the presumption of innocence is of significant importance"). Accordingly, as explained in Part III.B.3 infra, the court will take great care to provide the venire with a plausible and nonprejudicial explanation for these additional measures.

6.    Defendants' Opposition

Throughout their response to the Government's Motion, Defendants seek to analogize this case to several others in which anonymous jury motions were ostensibly denied. (Defs.' Opp'n at 5, 8-9.) None of these decisions, however, persuade the court to reach a different

conclusion.  Perhaps most critically, in many of the cases cited by Defendants as examples of similar factual scenarios where anonymous jury motions were "denied," the courts nonetheless required daytime sequestration of the jury and imposed a significant degree of anonymity.  See infra.  Thus, in two particularly significant ways, the procedures that will be used in this case will result in no greater prejudice to Defendants than that generated by the measures adopted in many of the cases Defendants cite in opposition to the Government's Motion.  Moreover, even accounting for decisions in which courts refused to impose any protective measures, each of these cases is distinguishable on the basis of the substantive factors courts use to determine whether there is "strong reason" to protect the jury.

For example, in Millan-Colon—where the Government "offered no proof, beyond innuendo" regarding the defendant's affiliation with a criminal enterprise—the court formally denied the motion for an anonymous and fully sequestered jury, but nonetheless precluded the questioning of jurors as to their exact addresses or places of employment and required jurors to be kept in the custody of the U.S. Marshals upon their arrival and until the close of court each day.  834 F. Supp. at 85-86.  In Gambino, the defendants were charged with racketeering based on predicate acts of illegal gambling and loansharking, charges that hardly compare to the serious crimes of violence allegedly committed by Defendants in this case.  See 818 F. Supp. at 540.  And in terms of media attention, Gambino had attracted "virtually none."  Id.

Melendez is ostensibly more similar to the facts of this case.  There, defendants were alleged members of a "highly organized drug distribution operation that employed tactics of fear, violence and intimidation to gain control over a significant portion of the cocaine and heroin trade" in Brooklyn, and were charged with numerous acts of kidnapping, murder, assault, money laundering, and possession of illegal firearms.  743 F. Supp. at 135-36.  The court observed,

26

however, that apart from an ex parte affirmation—which the court refused to consider—"there has been no proof offered by the Government, other than bare assertions, that these defendants attempted to interfere with the judicial process in the past or in connection with this case in particular." Id. at 138. Moreover, "[e]xcept for the presence of a reporter at a suppression hearing, the Government [had] not provided the Court with any pretrial publicity of this case in any media, nor [had] the Court observed any such publicity on its own." Id. Nonetheless, despite the lack of evidence of past attempts to obstruct justice and absence of any media attention, the court actually granted a limited version of the Government's anonymous jury request, excluding from voir dire jurors' first names, residential addresses, and employer names and addresses, and kept jurors in the custody of the U.S. Marshals upon their arrival and until the close of court each day. Id. at 138-39 (reasoning that "the crimes charged here are of a very serious nature, the size and resources of the alleged drug organization afford the defendants with access to means to harm or threaten jurors and there are allegations to threats to witnesses"). Thus, in a case with far less publicity than this one has generated already, the court in Melendez still employed a mostly anonymous and daytime-sequestered jury.

Similarly, in United States v. Coonan, defendants were charged with predicate acts including "murder, attempted murder, kidnapping, loansharking, extortion, and narcotics trafficking as a part of a racketeering enterprise known as the Westies." 664 F. Supp. 861, 862 (S.D.N.Y. 1987). There was "no suggestion in the papers that any defendant or co-conspirator had attempted in any way to tamper with a jury or juror, either by bribery, harassment, intimidation or otherwise," even though defendants and their co-conspirators had been previously involved in numerous felony prosecutions. Id. Although the court nominally denied the Government's motion, as in Millan-Colon, it nonetheless precluded the questioning of jurors

27

as to their exact addresses or places of employment and required jurors to be kept in the custody of the U.S. Marshals upon their arrival and until the close of court each day.  Id. at 863.

Finally, Defendants point to a recent case in the Southern District as support for their position.  See United States v. Mostafa, 7 F. Supp. 3d 334 (S.D.N.Y. 2014).  In Mostafa, the defendant was charged with hostage taking and providing and concealing material support and resources for terrorists and terrorist organizations.  Id. at 336.  Significantly, eight years earlier, the defendant had been tried—without an anonymous jury—and convicted of criminal charges of incitement in the United Kingdom, and there was "no harassment of jurors or any security incidents with respect to witnesses."  Id.  As a result, despite the serious nature of the charges, the court denied the Government's motion for an anonymous and semi-sequestered jury.  Id. at 338 ("This case presents a fact pattern that has only two of the elements the Second Circuit requires:  serious charges and significant media attention.  Those elements do not, however, distinguish this case from any number of cases tried in this district each year.").

Mostafa, however, is distinguishable from the present case.  In Mostafa, the defendant had no relationship with a criminal enterprise whose unindicted members were known to be at large in the very community where jurors lived, and thus lacked a contemporaneous ability to harm the jury.  Moreover, whereas Mostafa involved only one defendant, here there are three— and one is the alleged former leader of the local criminal enterprise at issue.  In addition, another court in the Southern District has distinguished the charges in Mostafa as being less serious than charges involving conspiracy to commit murder, which every defendant in this case is alleged to have committed, at a minimum.  See United States v. Al Fawwaz, No. 98-CR-1023 (LAK), 2014 WL 5005917, at *2 (S.D.N.Y. Sept. 30, 2014).  Thus, relative to Mostafa, reasonable jurors are much more likely to view these Defendants as dangerous, and Defendants have a much greater

ability to harm the jury.[12]  And ultimately, "it is important to bear in mind that the . . . 'decision whether or not to empanel an anonymous jury is left to the district court's discretion.'"  Al Fawwaz, 2014 WL 5005917, at *2 (quoting Paccione, 949 F.2d at 1192).  As a result, even if this case were "identical to Mostafa in the pertinent respects, and as we have seen it is not, it would be entirely appropriate for this Court to weigh the considerations differently and to reach a different conclusion as to the appropriateness of an anonymous jury."  Id.  Thus, because the Government has established "strong reason" for protecting the jury, the court concludes that empaneling an anonymous and semi-sequestered jury does not violate Defendants' rights under the Fifth or Sixth Amendments.

## B.    Reasonable Precautions

Having concluded that an anonymous and semi-sequestered jury is warranted, the court must consider what precautions can be taken to minimize any potential prejudicial effect these measures might otherwise have on Defendants.  See United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994) ("If an anonymous jury is warranted, a defendant's fundamental rights must be protected by the court's conduct of a voir dire designed to uncover bias as to issues in the cases and as to the defendant, and by taking care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities." (citation and internal quotation marks omitted)).

---

[12] In a footnote, Defendants point out that Laurent has been previously acquitted of violent conduct in both New York State and federal court in Brooklyn, without the use of an anonymous jury.  (Defs.' Opp'n at 7 n.3.)  In the federal case, Laurent—the only defendant—was acquitted by a jury of the illegal receipt of a firearm and ammunition while under felony indictment, in violation of 18 U.S.C. § 922(n).  Superseding Indictment ¶ 1, United States v. Laurent, No. 11-CR-322 (JBW) (E.D.N.Y.), ECF No. 52; J. of Acquittal, Laurent, No. 11-CR-322 (JBW), ECF No. 88.

In the state case, Laurent—again, the only defendant—was charged with criminal possession of a weapon and reckless endangerment.  See Jessica Dye, Judge Questions 2d Circuit Ruling on Firearm Possession, Reuters, Nov. 22, 2011 (noting 2010 state court indictment).  Unfortunately, defense counsel has not provided the court with any evidence to substantiate the procedural history or disposition of this case, and the state court docket relating to the case, People v. Laurent, Indictment No. 6052/2010, has been sealed.  In any event, whether the court has access to this docket is irrelevant, as these cases clearly involved fewer defendants and far less serious criminal charges.

1.    <u>Voir Dire</u>

The Government has proposed that the court withhold the full names, precise addresses, and workplaces of members of both the venire and petit juries.  (Gov't Mot. at 1.)  Defendants contend that empanelling an anonymous jury "through the process that the Government suggests would deprive the Defendants of their due process rights by withholding information essential to their effective use of peremptory challenges during <u>voir dire</u>."  (Defs.' Opp'n at 10.) Specifically, they argue that in order to "effectively and meaningfully exercise a peremptory challenge, a defendant must have some basic information about the potential jurors, such as their names, places of residence and facts regarding their employment."  (<u>Id.</u>)  Defendants maintain that because employment is "sometimes a critical factor in determining a juror's suitability and neighborhood of residence may sometimes be a proxy for personal experiences," they must have access to this information in making meaningful use of peremptory challenges.  (<u>Id.</u>)

Although Defendants have the constitutional right to a meaningful voir dire, <u>see</u> <u>United States v. Quinones</u>, 511 F.3d 289, 295 (2d Cir. 2007), "[t]he questioning of potential jurors on voir dire is . . . quintessentially a matter for the discretion of trial courts."  <u>United States v. Lawes</u>, 292 F.3d 123, 128 (2d Cir. 2002); <u>see also</u> <u>United States v. Tutino</u>, 883 F.2d 1125, 1133 (2d Cir. 1989) ("The decision as to the questions to be asked in <u>voir dire</u> largely rests within the informed discretion of the trial judge." (citing <u>Rosales-Lopez v. United States</u>, 451 U.S. 182, 189 (1981))).  Although the court is "required to permit at least some questioning with respect to any material issue that may actually or potentially arise during the trial," "it need not include specific points requested by a particular defendant" in order to be fair to the defendant.  <u>Tutino</u>, 883 F.2d at 1133 (citing <u>United States v. Taylor</u>, 562 F.2d 1345, 1355 (2d Cir. 1977)).  "As long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in

the cases and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal." United States v. Wilson, 493 F. Supp. 2d 397, 400-01 (E.D.N.Y. 2006) (quoting United States v. Barnes, 604 F.2d 121, 140 (2d Cir. 1979)).

Here, the Government's proposal will not prevent Defendants from having access to the information necessary to make meaningful use of peremptory challenges. Significantly, Defendants have not articulated any reason why they must know prospective jurors' names.[13] Nevertheless, Defendants argue that they need access to prospective jurors' addresses, since the Indictment alleges that a specific neighborhood has been targeted by gang activity, and jurors who live there and may fear that they "narrowly escaped a threat of violence may well have a difficult time remaining impartial." (Defs.' Opp'n at 11.) Accordingly, Defendants maintain that disclosing prospective jurors' addresses is necessary to determine whether to ask if jurors have knowledge of the Defendants, the alleged victims, or any of the locations to be mentioned at trial. (Id.) Pursuant to the Government's proposal, however, prospective jurors will be permitted to disclose the general neighborhood in which they live. (Gov't Mot. at 14; Gov't Reply at 1.) Thus, Defendants fail to explain why jurors' addresses must be disclosed before pursuing this line of inquiry. Moreover, the court intends to ask all prospective jurors—regardless of their neighborhood of residence—whether they have personal knowledge of Defendants, the alleged victims, or any of the locations or alleged crimes at issue in this trial, and

---

[13] In a footnote, Defendants appear to suggest that access to jurors' names is necessary for Defendants to conduct Internet searches to research the veracity of jurors' answers during voir dire. (Defs.' Opp'n at 11 n.5.) To the extent that Defendants suggest that the court should presume jurors are generally untruthful or refuse to follow instructions, they are without justification. See, e.g., Penry v. Johnson, 532 U.S. 782, 799 (2001) ("We generally presume that jurors follow their instructions."); United States v. Elfgeeh, 515 F.3d 100, 129 (2d Cir. 2008) (same); see also United States v. Colombo, 869 F.2d 149, 151-52 (2d Cir. 1989) (noting the "expectation that a prospective juror will give truthful answers concerning her or his ability to weigh the evidence fairly and obey the instructions of the court"); United States v. Langford, 990 F.2d 65, 69-70 (2d Cir. 1993) (affirming denial of request for new trial where juror gave intentionally false answer but was not trying to get on the jury by doing so, and defendant presented "absolutely no evidence" that the juror "was in any way biased or prejudiced against" the defendant). To the extent Defendants seek access to jurors' names in order to circumvent the nondisclosure of jurors' residences and places of employment, of course, the court will not permit it.

furthermore, whether they have been victims of similar crimes in the past or have any existing relationship with law enforcement.  (See Defs.' Opp'n at 11; id. at 11 n.4.)  As a result, Defendants will have access to the information they need regarding prospective jurors' personal experiences, even without knowledge of their residential addresses.

Finally, the Government's proposal would not limit inquiry into the occupations of the jurors, only information about their specific places of employment.  (See Gov't Mot. at 14; Gov't Reply at 1.)  "The defense therefore will have access to the information it seeks on this issue." United States v. Bellomo, 954 F. Supp. 630, 655-56 (S.D.N.Y. 1997).  Thus, with respect to Defendants' access to information about prospective jurors, the Second Circuit's decision in United States v. Wong is particularly instructive:

> Although the district court precluded disclosure of the jurors' names, addresses, and employers, the court questioned prospective jurors about their familiarity with the case, the defendants and the crime scenes, and inquired about their neighborhoods, marital status, employment, spouse's and children's employment, education, organizational affiliations, ethnicity, military service, and other matters.  This extensive voir dire adequately explored prospective jurors' "bias as to issues in the case and as to the defendants," and "was more than sufficient to enable the defendants to exercise their challenges meaningfully, and to obtain a fair and impartial jury."

40 F.3d 1347, 1377 (2d Cir. 1994) (internal citations omitted) (quoting Barnes, 604 F.2d at 140; Tutino, 883 F.2d at 1133).  Consequently, "juror's names, addresses, and places of employment, are not vital to the defendants' ability to uncover bias among jurors" in this case either.  United States v. Taylor, No. 10-CR-268 (DLI), 2014 WL 1653194, at *18 (E.D.N.Y. Apr. 24, 2014). Especially since Defendants will have ample opportunity to suggest additional areas of inquiry for voir dire, the defense "should have no problem in assessing the possible bias of prospective jurors."  United States v. Scala, 405 F. Supp. 2d 450, 453-54 (S.D.N.Y. 2005).

2.     <u>Jury Questionnaire</u>

Defendants further argue that if an anonymous jury is to be empaneled, in order to protect their Fifth and Sixth Amendment rights the court should require jurors to complete a written questionnaire "to gain the insight that the withheld information would have provided."  (Defs.' Opp'n at 19.)  The Government contends, however, that because it requests "only that the names, precise addresses and workplaces be withheld from the parties, and no other alterations to the typical jury selection process," the use of a questionnaire is unnecessary, since the court will conduct a "thorough and probing" voir dire.  (Gov't Mot. at 15.)

"Whether to use a jury questionnaire is within the discretion of the Court."  <u>United States v. Tomero</u>, 486 F. Supp. 2d 320, 324-25 (S.D.N.Y. 2007) ("While some courts on occasion have used questionnaires in cases involving anonymous juries, defendants cite no case holding that such a measure is mandatory when an anonymous jury is empaneled.").  In fact, the Second Circuit has specifically held that courts are not required to use questionnaires, even when empanelling an anonymous jury.  <u>See</u> <u>United States v. Quinones</u>, 511 F.3d 289, 300 n.8 (2d Cir. 2007) ("In approving the use of questionnaires as part of voir dire, we do not hold that district judges are ever obligated to make use of this procedure in selecting juries."); <u>see also</u> <u>United States v. Treacy</u>, 639 F.3d 32, 47 (2d Cir. 2011) (district judge's personal policy against using questionnaires was "well within his bailiwick as a trial judge so long as he conducts adequate voir dire by some other means," and offers "a rational, non-arbitrary reason for his policy").

Defendants insist, however, that a questionnaire, "in which jurors give honest answers without the possibility of being prejudiced or tainted by fear or an assumption about the dangerousness of the Defendants, would alleviate some prejudice to the Defendants caused by the withheld information."  (<u>Id.</u>)  To the extent Defendants reason that jurors are more likely to

give honest answers through a written questionnaire, the court takes no position on this question. Nevertheless, the court finds that utilizing a questionnaire will conserve judicial resources by saving a substantial amount of time relative to a jury selection process in which the entire voir dire is conducted orally. Therefore, the court will require members of the venire to complete a detailed questionnaire, drafted with input from the Government and counsel for Defendants, to screen for juror bias. Then, after consultation with counsel, the court will conduct voir dire for each prospective petit juror, in an individually sequestered setting, to uncover any further bias. Through the questionnaire and the individual questioning, "the parties will be apprised of all relevant information concerning each potential juror, despite the fact that the name, address, and place of employment of jurors will not be disclosed." Wilson, 493 F. Supp. 2d at 401. This process will ensure that Defendants have a meaningful opportunity to conduct voir dire and thus protect Defendants' right to an impartial jury. See id. (citing Barnes, 604 F.2d at 140).

### 3.    Jury Instructions

Finally, the Second Circuit "has repeatedly held that a defendant's presumption of innocence is properly maintained where the court gives a neutral and non-prejudicial explanation to the jury regarding the need for anonymity." United States v. Prado, No. 10-CR-74 (JFB), 2011 WL 3472509, at *9 (E.D.N.Y. Aug. 5, 2011) (citing Thai, 29 F.3d at 801; United States v. Paccione, 949 F.2d 1183, 1193 (2d Cir. 1991); Tutino, 883 F.2d at 1133). Here, the court will instruct prospective jurors that the reason for their anonymity is to maintain their personal privacy and their ability to render a fair verdict in light of the media and public attention that this trial is likely to receive. The court will also instruct petit jurors that transportation and lunch are being provided to further protect their privacy and to ensure a timely start to each session of what the parties expect will be a lengthy trial. See United States v. Wong, 40 F.3d 1347, 1377 (2d Cir.

1994).  Moreover, the court will emphasize that these are not unusual procedures.  See United States v. Locascio, 357 F. Supp. 2d 558, 560 (E.D.N.Y. 2005) ("[I]t is an unfortunate reality that a significant number of the cases tried in this district have required proceeding with such a selection process.").  It is well established that these explanations are plausible, appropriate, and nonprejudicial.  See, e.g., United States v. Kadir, 718 F.3d 115, 120-21 (2d Cir. 2013); Quinones, 511 F.3d at 296 (citing Paccione, 949 F.2d at 1192); Wilson, 493 F. Supp. 2d 397, 401 (E.D.N.Y. 2006) (citing United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995)).

## IV.    CONCLUSION

Having balanced Defendants' interests in conducting meaningful voir dire and in maintaining the presumption of innocence against the jury's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict, the court has determined that an anonymous and semi-sequestered jury is warranted. Furthermore, the court will utilize a questionnaire to screen the venire for potential bias at the beginning of the jury selection process.  Therefore, the Government's motion is GRANTED in part and DENIED in part.

Accordingly, the court will withhold the full names, precise addresses, and workplaces of members of both the venire and petit juries.  Prospective jurors may, however, be required to disclose the general neighborhood where they live, as well the nature of their employment.  In addition, members of the petit jury will be transported to and from an undisclosed location, and will remain in the custody of the U.S. Marshals at the courthouse throughout each day of trial.  In order to minimize prejudice to Defendants, the court will not only provide prospective jurors with a credible, neutral, and nonprejudicial explanation for their anonymity, but it will also

conduct a thorough voir dire designed to uncover any bias as to Defendants or the issues in this case.

The parties are also DIRECTED to consult, and by Friday, November 14, 2014, propose a schedule for providing the court with a questionnaire for its consideration.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York          NICHOLAS G. GARAUFIS
       November 7, 2014            United States District Judge